[Civ. No. 1419.    Third Appellate District.—December 18, 1915.]

LELAND CONGDON, a Minor, by H. W. Congdon, His Guardian, Respondent, v. CALIFORNIA DRUG & CHEMICAL COMPANY (a Corporation), Appellant.

NEGLIGENCE—INJURIES TO DRIVER OF DELIVERY WAGON—EXPLOSION OF AMMONIA — PROXIMATE CAUSE OF INJURY — PLEADINGS AND EVIDENCE—FAILURE TO FASTEN CORK.—In this action for personal injuries received by the driver of a delivery wagon from burns caused by the popping out of the cork from a demijohn of concentrated ammonia which he was engaged in delivering, it is held that, in view of the admissions of the answer and the testimony of the plaintiff—who alone was able to describe the accident and the circumstances surrounding it—the jury were warranted in the implied findings that the defendant was guilty of negligence in sending out the demijohn without securing the cork by seal, wire, or other means, and that the plaintiff was not guilty of contributory negligence in the way he loaded or drove his wagon, or in the matter of the handling of the demijohn after it had been placed therein.

ID. — MINORITY OF PLAINTIFF — ELEMENT AFFECTING RESPONSIBILITY — INSTRUCTIONS. — In such an action the minority of the plaintiff should not be presented to the jury as an element affecting his responsibility, when the nature of his employment, his intelligence, and his experience in the kind of work he was doing is taken into consideration, but instructions to such effect are not prejudicially erroneous where the jury is also instructed that notwithstanding such minority, the plaintiff's conduct was to be judged by "the knowledge, experience, and judgment that he possessed."

APPEAL from a judgment of the Superior Court of Kings County, and from an order denying a new trial.    M. L. Short, Judge.

The facts are stated in the opinion of the court.

Haas & Dunnigan, and John G. Covert, for Appellant.

Earl Rogers, and H. P. Brown, for Respondent.

CHIPMAN, P. J.—Plaintiff brings the action, by his guardian *ad litem,* to recover damages for injuries alleged to have been suffered while in the employ of defendant.   He recovered judgment, from. which and from the order denying a motion for a new trial defendant appeals.

It is alleged in the complaint that, in the month of February, 1912, plaintiff, who was then of the age of nineteen years, was employed by defendant in the work of driving an automobile truck and the delivery of packages from defendant's place of business to its various customers in Los Angeles County, and that, after so working for about four months, defendant shifted plaintiff's employment to driving a delivery wagon drawn by a horse; that at no time during said employment did plaintiff have any knowledge of drugs and chemicals of any kind nor did he understand the natural dangers of said employment or dangers of handling the drugs and chemicals placed in his possession for delivery.   The circumstances attending the injury are stated as follows: "That on the twenty-eighth day of June, 1912, and while so engaged as aforesaid with the said defendant, the said defendant caused to be placed in said wagon aforesaid, for delivery, a gallon demijohn filled with and labeled 'concentrated ammonia,' to be by said Leland Congdon delivered to one of its customers in said city of Los Angeles; that the said Leland Congdon thereafter started on his way with said horse and wagon and said demijohn so labeled 'concentrated ammonia' to deliver the same as directed by said defendant; that in the course of the trip from the said place of business of the said defendant, then located at numbers 843 and 855 Stephenson Avenue, said city of Los Angeles, the jolting of said wagon in passing over the rough places in the street caused the said demijohn to be turned over on its side, and it was shifting about in the bottom of said wagon, when the said Leland Congdon halted said horse and alighted from the said wagon, and took hold of the said demijohn and was about to place the same in a box and place some excelsior around it to prevent it from again turning over or working about in said wagon, when the cork in said demijohn which had not been secured in any way,

or tied down, popped out of the said demijohn and the contents of said demijohn, to wit, the ammonia therein, shot out of the demijohn and into the face and eyes of the said Leland Congdon." Then follows a detailed statement of medical treatment given in an effort to preserve Leland Congdon's eyesight, despite which he suffered the total loss of his left eye and serious injury to his right eye. It is alleged that "none of the agents or representatives of said defendant ever at any time or at all in any way warned or advised the said Leland Congdon of the dangers incident to the handling of ammonia put up in the way that the same was put up in said demijohn, or the dangers of being employed in or about the drugs and chemicals, which he was required to handle and deliver as aforesaid," and that by reason of his youth and inexperience and lack of knowledge "he did not know, appreciate, or understand the difficulties and dangers of his said employment"; that in preparing said ammonia for delivery by plaintiff defendant "placed in the hole in the neck of said demijohn a common cork, and did not secure said cork by seal, wire, or other means, and by reason of the action of said ammonia in said demijohn by being jolted around in said wagon and by reason of the action of the warm weather thereon, the said ammonia did expand, and the cork in said demijohn not being secured as aforesaid popped out of said demijohn and the said ammonia flew therefrom into the face and eyes of the said Leland Congdon with the result as hereinabove alleged"; that said cork "should have been secured in said demijohn by seal, wire, or other means, so as to have prevented its being so forced out as aforesaid, and that the failure of said defendant to so secure said cork was neglect and carelessness and want of ordinary care on its part," and "said injury was wholly caused by reason of said wrongful acts, carelessness, neglect, and want of ordinary care on the part of said defendant."

The answer admits the minority of plaintiff as alleged; admits his employment as alleged, but denies the averments of plaintiff's want of knowledge of drugs and chemicals and the danger attending the handling of the same; admits that, on June 28, 1912, "defendant did.cause to be placed in said delivery wagon a gallon demijohn filled with and labeled 'concentrated ammonia,' to be delivered by plaintiff to one of defendant's customers"; alleges that plaintiff "did at said time know the character of said concentrated ammonia and

did know its liability to explode and did know that the same was dangerous''; admits the facts set out in the complaint as to the jolting about of the demijohn and alleges that said ''shifting was caused by the careless manner in which the said Leland Congdon placed the same in said wagon.'' Admits that plaintiff ''was about to place the same in a box and was about to place some excelsior around it to prevent it from again turning over or working about in said wagon,'' and alleges that he should have so secured it at the time he placed it in the wagon, and that he was careless and negligent in not doing so; that he well knew at that time that he should have so secured the demijohn; ''admits that the cork in said demijohn did come out,'' but on information denies that the cork was not tied down or secured in any manner; denies that the ammonia struck the face and eyes of plaintiff and denies the alleged result of the escape of ammonia; alleges that defendant ''did at all times inform plaintiff of the nature and character of the work required of him to be done and of the danger by him incurred, and did in particular inform said Leland Congdon of the ,danger of carrying ammonia in a demijohn in a delivery wagon, and did warn and instruct said Leland Congdon at all times to see that the same was securely packed in a box with excelsior surrounding it to prevent any jarring of the same''; denies that plaintiff, by reason of inexperience or want of knowledge, did not appreciate the danger of his said employment. It is further alleged that when plaintiff ''picked up said demijohn and did place the same in said delivery wagon the cork of the same had not yet been secured, and that he did know that the same should not be placed in said delivery wagon without having said cork secured. Defendant admits that by reason of the action of said ammonia in said demijohn by being jolted around in said wagon, and by reason of the action of the warm weather thereon, the said ammonia did expand and the cork in said demijohn, not being secured, did pop out of said demijohn and the said ammonia flew therefrom, but as to whether or not said ammonia flew into the face or into the eyes or into either eye of said Leland Congdon this defendant is not informed. This defendant admits that said cork should have been secured in said demijohn by seal, wire, or other means so as to prevent its being forced out; this defendant denies that the failure of this defendant to so secure said cork was

neglect or carelessness or want of ordinary care on its part. Defendant alleges that said demijohn had not at said time been prepared for transportation in the said delivery wagon, and that said Leland Congdon did take the same and did place the same in said wagon before the same was fully prepared for transportation therein by this defendant, and that he did know the same was dangerous and did know that the cork in the same had not been secured, and that he did place the same in said delivery wagon without instructions from this defendant or any of its officers and purely upon his own responsibility.''

Summing up the defense, it is alleged that plaintiff's injury was caused solely by his carelessness and negligent act, first, in placing the demijohn in the wagon before it was ready for transportation; second, in failing to place it in a box surrounded with excelsior; third, in driving the wagon negligently so as to cause the demijohn to be jolted and moved about in the wagon; and, fourth, in attempting to lift the demijohn in such manner that its opening where the cork was situated was directed toward plaintiff.

We have given the pleadings somewhat at length, for it will thus be seen that the issues are thereby considerably narrowed.

The answer alleges that plaintiff ''did know the character of said concentrated ammonia and did know its liability to explode and did know that the same was dangerous.'' If plaintiff knew these facts it must be assumed that defendant believed them to exist.

The answer admits that plaintiff took hold of said demijohn ''and was about to place the same in a box and was about to place some excelsior around it to prevent it from again turning over or working about in said wagon.'' The answer also admitted that ''by being jolted around in said wagon and by reason of the action of the warm weather thereon the said ammonia did expand and the cork, not being secured, did pop out of said demijohn and the said ammonia flew therefrom.'' The answer admits ''that said cork should have been secured in said demijohn by seal, wire, or other means so as to prevent its being forced out.''

The controverted issues of fact may be reduced to the following: Was it defendant's duty to see to it that the liquid in the demijohn, or concentrated ammonia, was secured by a cork

sealed, wired, or otherwise fastened before being placed in the
wagon? Was the failure properly to secure the cork in the
demijohn the proximate cause of the injury? Was plaintiff
guilty of contributory negligence either by reckless driving or
careless handling of the packages he was hauling or in hand-
ling the demijohn at the time of the accident? Was plaintiff
sufficiently instructed as to the dangerous character of the
concentrated ammonia, or was he of such mature age and ex-
perience as not to require any instruction in his employment?
Was the defendant guilty of culpable negligence?

The uncontroverted evidence was that plaintiff was twenty
years old in June, 1912; had received a grammar school edu-
cation and business course in high school—"just took book-
keeping but knew nothing of chemistry"; he entered defend-
ant's employment as driver of a gasoline delivery truck in
February, 1912, and later changed to driving a horse and
wagon and continued in defendant's service until June 28,
1912, the day of the accident.

Plaintiff testified that he reported to Mr. Bryant, defend-
ant's shipping clerk, for duty and that nothing special was
said about his work; "he give me my orders to take goods to
a certain place. He just give me a bill of goods to deliver.
He give me some tissue with the numbers of boxes and I
carried the boxes out and put them in the truck and delivered
the goods. The goods were put up in the boxes by him and
turned over to me. I took the boxes and put them in the
truck and delivered them pursuant to what instructions were
on the tissues. These tissues were the same as bills, tissue
paper, and there was a bill for each box. The address was
on it. . . . This manner of employment continued right along
during the time that I was in the employ of the defendant.
Each day I would receive these orders and these boxes and
go out and deliver them. . . . Q. Now, in the course of your
employment there, did any of these gentlemen ever say any-
thing to you about any of these packages that you were de-
livering? A. They did not, nor did they call my attention
to any particular manner in which any of them should be
packed, particularly the demijohns. We did not have any-
thing to do with the packing at all. My duties did not in-
volve the preparation of any of these packages for delivery.
Q. And what was the general custom there in setting these
packages out for delivery—were they placed in a particular

place for you to receive them? A. Yes, they had a place they put all the boxes and demijohns, and we would carry them out and put them on the platform on the back of our wagon. Sometimes they would put them on the back and we would load them up on the front end when we were starting. On the twenty-eighth day of June, 1912, when I started from defendant's shipping department, I had a load of boxes in the back and I had a demijohn of ammonia under the seat. That's the only way. I had a big load. There was a cork in the demijohn. It was just pushed in the neck of the bottle. It was not secured by anything. I think I placed the demijohn in the wagon. It was set out to be delivered, and had a tag to deliver it to a certain place. That had been the custom that prevailed there ever since I had been there. I had not seen any different custom. They never placed in my charge a demijohn containing this concentrated ammonia that had a cork secured in it, or that was packed in excelsior.'' He was asked to explain how he ''came to receive this shot of ammonia in the eye or eyes.'' ''A. I noticed that it had shifted and when I made my first stop I had an empty box and I went to take hold of it—I had delivered a box of goods, and was returning with the empty box—was putting the empty box in the wagon, and I took hold of the demijohn to put the concentrate of ammonia in—just as I got hold of it the cork flew out and went in my face—that is all I remember. I could not see after that. I crawled in the drug-store there and the druggist helped me. I could not walk, hardly. I could not see anything. I got down on my hands and knees and crawled for a ways. I got up, I think, before I got to the door. He helped me to the wash-basin to wash it off and washed my face and eyes out.'' He then describes the treatment given him and the effort made to preserve his eyesight. His left eye was finally removed and a glass eye substituted. ''Q. Now, then, this glass eye you have, is this a source of annoyance and trouble to you? A. Yes, I have to take it out every night and it hurts during the day sometimes, and if I go out in the evening it hurts. In riding, the pressure of the wind makes it hurt. It makes a mucous and it dries on there. It has more or less matter or accumulation there each day. I wash it two or three times a day sometimes. When I am out in the field engaged in any kind of work or riding along the road, this eye dries and causes a sticky substance and a

painful feeling; in the evening it is worse and in a cold wind. I take it out and clean it two or three times a day if I am where I can. I always do it at night. The loss of this eye interferes with the performance of my usual duties on the farm. I cannot see so good on that side, naturally. In working around anybody I have to be very careful. Q. Now, Mr. Congdon, have you ever had any education or instruction of any kind in regard to drugs or chemicals? A. No, sir. I have never had any instructions in any school in relation to such matters. Q. As I understand you, the defendant in this case never told you it was a dangerous matter to be handling these demijohns full of ammonia? A. No, sir. Q. And did the defendant or any of its officers ever tell you that you should securely fasten those corks in the ammonia bottles? A. No, sir. Q. Did they ever say anything at all about it? A. No, sir. Q. And you had had no previous experience— A. No, sir. Q. —In handling ammonia, had you? A. No, sir. Q. You had never seen a bottle of ammonia from which the cork was blown out on account of the accumulated gases inside? A. No, sir, never heard of it. Q. Never heard of it before? A. No, sir. Q. And did not know at the time there was any danger in handling this demijohn of ammonia? A. No, sir. . . . Q. Just state to the jury what effect, if any, the ammonia had on your face. A. Well, on my eyelids it made the skin come off and burn my hands and give me an awful headache. It had an effect on the right eye. I could not see out of it for a long time. Not to amount to anything. Not. as well as I could. I could hold it open for a little while at a time. That eye bothered me for a little while after I had the left one removed—that is for about two months. Before the accident happened I could see out of the left eye as well as I could out of the right eye. The left eye had not been previously damaged. Q. And the only affection that you have had that has caused the loss of it has been the ammonia in your eye as far as you know? A. Yes, sir. Q. Had you any knowledge or information about this occupation you had being a dangerous one? A. No, sir.''

His cross-examination developed nothing to materially affect his testimony in chief. As to the method of loading the wagon he testified: ''Sometimes Mr. Bryant put them in the back and we would load them up at the front end. We would place them in the truck in the way we wanted to carry

them out. A few articles were packed in boxes with excelsior around them, glass and such things. Sometimes the bottles were in boxes and there was not any excelsior around them. Q. You mention in your complaint when you started to take out the demijohn you started to put it in a box? A. Yes, sir. Q. What occurred for you to want to pack that in a box with excelsior in it? A. Well, I did not want it shaking around in the bottom of the wagon. I had not seen other demijohns or bottles packed in boxes with excelsior around them. I did not want it to break, so I put it in there, and there happened to be some excelsior in there. The excelsior was around some articles I had already delivered." He testified that Mr. Bryant assisted him in loading the wagon on the day of the accident. "Q. Now, then, you had made one delivery from the wagon on that trip? A. Yes, to this drugstore where the injury occurred. Q. And then when you came out to the wagon—was that where you first saw the demijohn lying on its side? A. No, sir, I picked it up once before, but I did not have no box to put it in. When I got there I thought I would put it in the box. Q. When you started out and put the demijohn under the seat of the wagon did you put any box or anything against it to keep it from falling? A. No, sir; I do not know as to that. Q. What was the custom in the way of packing your articles in the wagon in that regard? A. Well, if we could fix them in that way we did. I do not think we could do it in this case. I had such a big load that day. I do not think I could get the boxes under the seat. The load was mostly boxes with open tops and articles in them. The demijohn was about a foot tall. I could slip it under the seat. The demijohn was in the corner of the wagon when I started. I could not shove a box up against it. It was too big. I had some big boxes. I had some small boxes but we loaded them in so they would come out in order. Q. Well, you could have, with a change in the method of putting in the boxes, have packed the boxes up against it? A. I do not think that I could or I would have. I don't think there was room in there. It was only about that wide (indicating) under the seat. Right in front where I had the demijohn the seat came over around. The seat was the full length of the wagon. I had boxes under half of the seat, and there was a vacant space left for the demijohn. I don't think I could have shoved those boxes up against the

demijohn because there was not room enough.'' He was asked further to explain what occurred when the cork blew out of the demijohn and he answered: "I just picked the demijohn up and I had not got it anywhere nears out when the cork blew out. I had the box on the ground with excelsior in it. I was intending to put the demijohn in the box. I reached over into the wagon and took the demijohn and started to pull it toward me. As I started to pull it toward me the cork came out. . . . Q. Now, you are absolutely positive that nobody told you to be careful of these articles as they were taken out? A. Yes, sir. I never had any bottle or box break while I was delivering. I dropped a bottle in the store itself. I was not cautioned at that time by anybody. I do not know anything of other drivers having bottles blow out on them or spilled in any way. I never heard Mr. Bryant mention to the drivers to be careful with these articles. I never heard Mr. Clendenen tell them or Mr. Blumenberg or anybody during the entire four months say anything about any danger.'' He testified that it was a very hot day but did not think the sun shone on the demijohn. "Q. Now, just before your eye was taken out had there been any change in the situation? Was it aggravating or hurting you more? A. Well, they thought it was getting better, then the day before or two or three days before they took the eye out, my eye began to get weak again. That is, the right eye. They said they would have to remove the left eye to save the right eye. Then I was put under ether or something and the eye was removed and I remained there another week for treatment.''

We do not deem it necessary to give the testimony of the different physicians who treated plaintiff. There was abundant evidence to show that he was given proper medical attention and that the injury complained of was the direct result of the accident, and in no wise was attributable to improper treatment.

Some testimony was submitted by defendant tending to show that concentrated ammonia is not explosive; that when the cork is removed from the container fumes pass out but no liquid; that it is not caustic and will not burn the cuticle when in contact with it; that general instructions were given to drivers of delivery wagons to use care in handling chemicals,

but no witness was able to say that plaintiff had been personally instructed. Whatever the character of ammonia may be as to explosiveness or as to whether it burns the skin when in contact with it, the undisputed fact is that in the present instance it burned the skin around plaintiff's eyes, and so burned his left eye that he lost the use of it and that he was at the trial still suffering from the necessity of using a glass eye. We think, in view of the admissions of the answer and the testimony of plaintiff—and he alone was able to describe the accident and the circumstances surrounding it—the jury were warranted in the implied findings; that defendant was guilty of negligence in sending out the demijohn of concentrated ammonia without securely fastening the cork; that plaintiff was not guilty of contributory negligence in the way he loaded his wagon or in driving it or in handling the demijohn when he took hold of it to place it in a box.

It is urged that the law would impute to plaintiff the knowledge that "almost any drug or chemical is injurious when brought in direct contact with the eyeball," and that, "as matter of law the defendant had a right to assume that plaintiff was possessed of common knowledge, and as a matter of law the defendant was not obliged to instruct the plaintiff as to any matter of which he had knowledge or presumed knowledge." It may be that plaintiff knew ammonia brought in contact with the eyeball would injure it, and that he needed no instruction on that fact, still there remained to be considered by the jury the question whether in sending out the demijohn of ammonia without properly securing the cork defendant was not negligent and whether or not such negligence contributed to the injury.

In this connection it is claimed that the court erred in giving instructions to the jury which held the plaintiff "to a different degree of care for his own preservation than he would have been if he were a year older, whereas there is nothing in the proof or the circumstances which would justify the inference that the plaintiff was under any disability by reason of his age." One of the instructions was as follows: "You are further instructed that the conduct of a minor and the question as to whether he acted negligently or not must in the nature of the case be a question of fact for the jury, rather than of law, as it is the province of the jury to determine whether or not the minor duly exercised such judgment

as he possessed, taking into consideration his years, experience and ability.   The ordinary care which a minor of limited judgment and experience is called upon to exercise in a given act is not the same *quantum* of care which an adult would be called upon to use under the same circumstances.''

Other instructions followed in which this difference of responsibility is pointed out, the court saying: ''His [plaintiff's] conduct is to be judged in accordance with the knowledge, experience, and judgment he may possess when called upon to act.   And it is a question for you, gentlemen of the jury, to say whether in the performance of his task Leland Congdon duly exercised such judgment as he should possess, taking into consideration his years, his experience, and his ability in connection with his employment, and the risks and dangers thereof.''   Defendant cites *Lemasters* v. *Southern Pacific Co.,* 131 Cal. 105, [63 Pac. 128].

When we consider the nature of plaintiff's employment, his intelligence, and his experience in the kind of work he was doing, we do not think the fact of his minority (he was twenty years old) should have been presented to the jury as an element affecting his responsibility.   Coupled, however, with the qualification that he ''exercised such judgment as he possessed, taking into consideration his years, experience, and ability,'' and further stating that ''his conduct is to be judged in accordance with the knowledge, experience, and judgment he may possess when called upon to act, . . . taking into consideration his years, his experience, and his ability in connection with his employment, and the risks and dangers thereof''
—we feel assured that the jury were not influenced in any material degree by being reminded by the court of the fact that plaintiff was a minor, for, notwithstanding that fact, the jury were told that his conduct was to be judged by ''the knowledge, experience, and judgment he possessed.''

The judgment and order are affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 14, 1916.